PATIENCE DRAKE ROGGENSACK, C.J.
¶ 1. We review a published decision of the court of appeals,[1] which affirmed the Waukesha County Circuit Court's[2] denial of defendant Brett Dumstrey's (Dumstrey) motion to suppress evidence acquired after a stop and subsequent arrest. Dumstrey's motion challenged the legality of the stop and subsequent arrest on Fourth Amendment grounds.
¶ 2. After being followed by police for erratic driving, Dumstrey drove inside of the parking garage underneath his apartment building, where he was stopped by police and subsequently arrested for operating while intoxicated (OWI), contrary to Wis. Stat. § 346.63(l)(a) (2013-14).[3] Dumstrey does not challenge the fact that police had reasonable suspicion to *72 stop him. However, he argues that the officers' conduct violated the Fourth Amendment's prohibition against unreasonable searches and seizures because it occurred during a warrantless entry into a constitutionally protected area, curtilage of his home.
¶ 3. Therefore, the central question before us is whether the parking garage underneath the apartment building constitutes curtilage of Dumstrey's home such that it is protected by the Fourth Amendment. We also consider whether Dumstrey has shown a reasonable expectation of privacy in the parking garage, thereby warranting Fourth Amendment protections.
¶ 4. We conclude that the parking garage underneath this apartment building does not constitute curtilage of Dumstrey's home. We further conclude that Dumstrey has shown no reasonable expectation of privacy in the garage. Consequently, Dumstrey's stop and subsequent arrest in the garage did not violate the Fourth Amendment's prohibition against unreasonable seizures. Stated otherwise, the seizure did not occur after a warrantless entry into a constitutionally protected area. Accordingly, we affirm the decision of the court of appeals.
I. BACKGROUND
¶ 5. On the night of Friday, April 20, 2012, Officer Dejaríais, of the City of Waukesha Police Department, was off duty and was wearing plain clothes while operating his unmarked, personal vehicle. At approximately 10:30 p.m., Officer Dejaríais observed a vehicle, later determined to be driven by Dumstrey, pass him at a high rate of speed and then begin tailgating another vehicle. Officer Dejaríais subse *73 quently passed both of these vehicles, at which point Dumstrey accelerated and began tailgating Officer Dejaríais. Dumstrey continued speeding and changing lanes, and at one point, he was straddling both lanes.
¶ 6. After watching Dumstrey's vehicle for some time, Officer Dejaríais called the police department dispatcher and requested a squad response to a possible intoxicated driver. Around that same time, Officer Dejaríais pulled up next to Dumstrey at a red light, rolled down his window, and made eye contact with him. Dumstrey likewise rolled down his window, at which point Officer Dejaríais displayed his police badge and photo identification card. Officer Dejaríais pointed out Dumstrey's erratic driving and instructed him to pull over and wait because the police were coming. Dumstrey stared back at him with a "blank look" and "appeared to be very intoxicated." His eyes were "sleepy looking" and "kind of glassy." After the light turned green, Dumstrey continued to sit at the intersection. When the light turned yellow, he proceeded to drive through the intersection.
¶ 7. After driving through the intersection, Dumstrey stopped in the middle of the traffic lane, and Officer Dejaríais again pulled up next to him and told him to wait for the police. Dumstrey continued to stare at Officer Dejaríais and then drove off toward his apartment complex, consisting of five or six apartment buildings. Officer Dejaríais followed Dumstrey to a parking lot outside one of the apartment buildings where Dumstrey continued to drive around, as though "trying to lose" the officer. Subsequently, Dumstrey turned toward the parking garage underneath his apartment building, raised the garage door with his remote controlled opener, and "drove down beneath the apartment building into the parking garage."
*74 ¶ 8. Officer Dejaríais followed Dumstrey and parked his personal vehicle underneath the garage door so that the door would not come down and lock out the police response that he had requested. Officer Dejaríais then exited his vehicle and walked into the parking garage, toward where Dumstrey had parked in his assigned parking place. As Officer Dejaríais started approaching Dumstrey's vehicle, Dumstrey exited the vehicle and the two made contact. Officer Dejaríais instructed Dumstrey to stay put because the police were coming. He also displayed his police badge and photo identification, to which Dumstrey indicated disbelief that Officer Dejaríais was actually a police officer. Upon showing his badge and identification again, Dumstrey finally stopped and appeared to believe Officer Dejaríais. Shortly thereafter, the responding officer, Officer Lichucki, arrived on the scene.
¶ 9. Officer Lichucki entered the parking garage through the garage door under which Officer Dejaríais had parked his vehicle. Officer Lichucki immediately made contact with Dumstrey and began asking him investigative questions. Dumstrey stated that he had driven home from a Milwaukee Brewers baseball game at Miller Park and denied having consumed any alcohol. Upon his questioning, Officer Lichucki observed that Dumstrey was swaying back and forth and his "eyes were glassy and somewhat bloodshot." His speech was also "slurred," and Officer Lichucki could smell "an odor of intoxicants coming from his person." Officer Lichucki requested that Dumstrey submit to various field sobriety tests, all of which he refused to perform. At that point, Officer Lichucki arrested Dumstrey for OWI. Later, Dumstrey consented to an evidentiary blood test, which revealed that his blood alcohol level was .178.
*75 ¶ 10. Dumstrey moved to suppress, challenging the legality of the stop and subsequent arrest on the basis that his seizure occurred after a warrantless entry, in violation of the Fourth Amendment. At the hearing, testimony established that Dumstrey lives in the apartment building under which the parking garage is located. Approximately 30 tenants live in Dumstrey's apartment building, and the parking garage has approximately 30 parking places. The residents, including Dumstrey, pay for their assigned parking places in the garage and use the garage only for parking rather than for storage or other uses. Dumstrey testified that he can enter the parking garage only through the remote controlled garage door or through a locked door on the inside of the apartment building. All of the other tenants have access to the parking garage through these same means. In order to get from the parking garage to his home, Dumstrey uses the building's elevator. This elevator is likewise utilized by all other tenants.
¶ 11. The circuit court ultimately denied Dumstrey's motion, and he pled guilty to OWI, second offense, in violation of Wis. Stat. § 346.63(l)(a). The court of appeals affirmed, holding that there was no Fourth Amendment violation because the parking garage underneath the apartment building did not constitute curtilage of Dumstrey's home, and he did not have a reasonable expectation of privacy in the parking garage.[4] State v. Dumstrey, 2015 WI App 5, ¶ 14, 359 Wis. 2d 624, 859 N.W.2d 138. We granted Dumstrey's petition for review.
*76 II. STANDARD OF REVIEW
¶ 12. "[A] curtilage determination presents an issue of constitutional fact," State v. Martwick, 2000 WI 5, ¶ 16, 231 Wis. 2d 801, 604 N.W.2d 552, as does the general question of "whether police conduct violated the constitutional guarantee against unreasonable searches and seizures," State v. Griffith, 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72. Questions of constitutional fact are subject to a two-step standard of review. Id.
¶ 13. We uphold a circuit court's findings of historic fact unless they are clearly erroneous. State v. Fonte, 2005 WI 77, ¶ 11, 281 Wis. 2d 654, 698 N.W.2d 594. A finding is clearly erroneous if "it is against the great weight and clear preponderance of the evidence." State v. Sykes, 2005 WI 48, ¶ 21 n.7, 279 Wis. 2d 742, 695 N.W.2d 277 (internal quotation marks omitted) (quoting State v. Tomlinson, 2002 WI 91, ¶ 36, 254 Wis. 2d 502, 648 N.W.2d 367). We then "apply the constitutional principles to the facts at hand to answer the question of law." Martwick, 231 Wis. 2d 801, ¶ 23.
III. DISCUSSION
¶ 14. The Fourth Amendment of the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
*77 U.S. Const, amend. IV. Article 1, Section 11 of the Wisconsin Constitution contains a substantively identical provision that we have historically interpreted in accord with the Supreme Court's interpretation of the Fourth Amendment. State v. Arias, 2008 WI 84 ¶ 20, 311 Wis. 2d 358, 752 N.W.2d 748.
¶ 15. "Although our legal lexicon often presents 'searches and seizures' as an inseparable tandem, the two are constitutionally and analytically distinct." Id,., ¶ 25. Therefore, we first determine whether Dumstrey underwent a search or seizure for purposes of our Fourth Amendment analysis.
A. Search and Seizure
¶ 16. Searches affect privacy interests, such as bodily integrity and invasion of those places that a person has reserved for his or her individual use. See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Seizures, on the other hand, affect personal liberty interests such as the freedom of movement and the possession of one's property. See Delaware v. Prouse, 440 U.S. 648, 657 (1979).
1 17. We have recognized two types of seizure. State v. Young, 2006 WI 98, ¶ 20, 294 Wis. 2d 1, 717 N.W.2d 729. First, we have recognized the investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, a police officer may, under certain circumstances, temporarily detain a person for purposes of investigating possible criminal behavior even though there is not probable cause to make an arrest. Id. at 22. Such an investigatory stop must be preceded by the *78 officer's reasonable suspicion that a crime has occurred, or is about to occur. Id. at 21; State v. Houghton, 2015 WI 79, ¶ 30, 364 Wis. 2d 234, 868 N.W.2d 143. Second, an arrest is a seizure. State v. Ferguson, 2009 WI 50, ¶ 17, 317 Wis. 2d 586, 767 N.W.2d 187. Generally, if the police have probable cause to make an arrest, they may not need a warrant. United States v. Watson, 423 U.S. 411, 417-23 (1976).
¶ 18. Officer Dejaríais followed Dumstrey into the parking garage in order to effectuate an investigatory stop as to whether he was operating while intoxicated. Once inside the garage, Officer Dejaríais stopped Dumstrey after he had exited his vehicle, displaying his police badge and identification. Dumstrey does not challenge whether Officer Dejaríais had reasonable suspicion to stop him; therefore, we assume, without deciding, that reasonable suspicion for the investigatory stop existed. Once Officer Dejaríais stopped Dumstrey with reasonable suspicion, Officer Lichucki questioned Dumstrey and observed his physical characteristics, including his swaying, slurred speech, glassy and bloodshot eyes, and the odor of intoxicants emanating from his person. Dumstrey similarly does not challenge whether these observations gave rise to probable cause for his arrest; therefore, we likewise assume, without deciding, that probable cause existed. Accordingly, we conclude that Dumstrey was seized in the parking garage when he was stopped and subsequently arrested for operating while intoxicated.
¶ 19. We further conclude that Dumstrey was not subjected to a search while stopped in the parking garage. Visual observation in the context of a lawful *79 stop "does not constitute an independent search because it produces 'no additional invasion of [the suspect's] privacy interest.'" State v. Angiolo, 186 Wis. 2d 488, 497, 520 N.W.2d 923 (Ct. App. 1994) (alteration in original) (quoting Arizona v. Hicks, 480 U.S. 321, 325 (1987)); see also United States v. Jones, __ U.S. _, 132 S. Ct. 945, 953 (2012) (acknowledging that "mere visual observation does not constitute a search").
¶ 20. As set forth above, after Dumstrey was stopped, Officer Lichucki arrested him based on observations of his physical characteristics without further invading his bodily integrity. Therefore, aside from the stop and arrest, there was no additional invasion of Dumstrey's privacy interest. Consequently, the officers effectuated a seizure of Dumstrey, but no independent search occurred at that time.[5]
¶ 21. We now consider whether Dumstrey's seizure occurred within a constitutionally protected area, thereby constituting a warrantless entry in violation of the Fourth Amendment.
B. Garage Entry
¶ 22. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). "Indeed, ' [i]t is axiomatic that the physical entry of the home is *80 the chief evil against which the wording of the Fourth Amendment is directed.'" State v. Richter, 2000 WI 58, ¶ 28, 235 Wis. 2d 524, 612 N.W.2d 29 (alteration in original) (internal quotation marks omitted) (quoting Welsh v. Wisconsin, 466 U.S. 740, 748 (1984)). Given this heightened Fourth Amendment protection, where police effectuate a warrantless arrest inside of a home, the State must prove that the warrantless entry was justified by exigent circumstances. Ferguson, 317 Wis. 2d 586, ¶¶ 19-20.
¶ 23. "The protection provided by the Fourth Amendment to a home also extends to the curtilage of a residence." Martwick, 231 Wis. 2d 801, ¶ 26; State v. Walker, 154 Wis. 2d 158, 183, 453 N.W.2d 127 (1990), abrogated, in part, on other grounds by State v. Felix, 2012 WI 36, ¶ 42, 339 Wis. 2d 670, 811 N.W.2d 775. "[T]he curtilage is the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life and therefore has been considered part of [the] home itself for Fourth Amendment purposes." Oliver v. United States, 466 U.S. 170, 180 (1984) (internal quotation marks and citation omitted). The Fourth Amendment's protection against warrantless entry for arrest also has been reasoned to extend to places where the person "has a legitimate expectation of privacy in the invaded place." Minnesota v. Olson, 495 U.S. 91, 95 (1990) (internal quotation marks and citation omitted); United States v. Gooch, 6 F.3d 673, 676-77 (9th Cir. 1993) (recognizing reasonable expectation of privacy in a tent located on public campgrounds such that warrantless arrest of inhabitant requires exigent circumstances). We consider both constitutional contentions in turn.
*81 1. Curtilage
¶ 24. Prior to undertaking a case specific curtilage analysis, however, it is necessary to first discuss existing Wisconsin and Supreme Court law with respect to the Fourth Amendment's protection of a home's curtilage. Dumstrey points us to Conrad v. State, 63 Wis. 2d 616, 633, 218 N.W.2d 252 (1974), in support of the proposition that common space in the basement of an apartment building is "clearly within the curtilage" of the home. In Conrad, we considered whether the police conducted an unconstitutional search when they excavated a dead body approximately 450 feet from the defendant's house on his 40 acre farm. Id. at 620-21. We rejected any trespassory, curtilage analysis in favor of a reasonable expectation analysis and held that there was no unconstitutional search because the defendant harbored no reasonable expectation of privacy in the area of his property in question. Id. at 633-34.
¶ 25. In so holding, we relied on the Supreme Court's Katz decision, wherein the Court held that a search need not result from a physical trespass in order to be unreasonable under the Fourth Amendment. Katz, 389 U.S. at 352. Rather, a search may be unconstitutional in an area where a person holds a reasonable expectation of privacy. Id. at 352-53, 360-61 (Harlan, J., concurring).
¶ 26. We stated in Conrad that "[t]he importance of Katz is . . . that it foretold the possibility that, even in a place traditionally thought to be an area protected by the [F]ourth [A]mendment, protection would not be afforded in the absence of a subjective intent to exercise a reasonable expectation of privacy." Conrad, 63 Wis. 2d at 627. Based on this proposition, we stated *82 that Katz modified the previous curtilage analysis and effectively held that there could be no unconstitutional search of curtilage unless the defendant also held a reasonable expectation of privacy in that same area. Id. at 630-31. As further support for this proposition, we cited a previous opinion, Watkins v. State, 59 Wis. 2d 514, 208 N.W.2d 449 (1973) (per curiam), wherein we held that a warrantless search of a storage room in the basement of an apartment building did not violate the Fourth Amendment. Id. at 514-15. In Watkins, we did not relate a curtilage analysis but, rather, held that the defendant harbored no reasonable expectation of privacy in the area. Id.
¶ 27. In Conrad, we reasoned that the Katz test limited the curtilage test. We said,
[I]t appears that the rule of Katz, as explained by Wattenburg, is an explication or modification based on present-day concepts of the ancient curtilage test. It is also a limitation of it. Under the strict curtilage test, the subjective element of a reasonable expectation of privacy was omitted. There was, in effect, a legal presumption that all within the curtilage was protected.
Conrad, 63 Wis. 2d at 630. Conrad was a search case.
¶ 28. Recently, however, the Supreme Court has clarified that "Fourth Amendment rights do not rise or fall with the Katz formulation." Jones, 132 S. Ct. at 950. Rather, "the Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." Id. at 952. Like Conrad, Jones is a search case.
¶ 29. In Florida v. Jardines, _ U.S. _, 133 S. Ct. 1409 (2013), another search case, the Supreme Court confirmed that the curtilage of a person's home re *83 mains a constitutionally protected area without consideration of whether a reasonable expectation of privacy exists. There, the Court held that the front porch of a home constitutes curtilage and that officers executed an unconstitutional search when they conducted a trespassory dog sniff on that constitutionally protected area. Id. at 1415-17. In so holding, the Court harkened back to the reasoning behind the Fourth Amendment's heightened protection of the home, stating that at its "very core stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." Id. at 1414 (internal quotation marks omitted) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).
¶ 30. Given the Supreme Court's recent emphasis on the distinction between the trespassory, curtilage analysis and the reasonable expectation analysis, we conclude that our statements in Conrad, 63 Wis. 2d at 627, 630-31, may be read as inconsistent with that distinction.[6] However, if we are to employ the same trespassory, curtilage analysis to a seizure as has been applied to a search, we must consider separate and distinct from a reasonable expectation of privacy whether the area in question is constitutionally protected curtilage.
¶ 31. We previously have conducted a curtilage analysis to determine whether an arrest occurring within curtilage of a home violates the Fourth Amendment's protection against warrantless entry. Walker, *84 154 Wis. 2d at 182. In Walker, police entered a resident's fenced-in backyard without a warrant in order to arrest him. Id. In determining whether the arrest was lawful, we stated:
Read together, Payton and Oliver require that police obtain a warrant before entering either the home or its curtilage to make an arrest absent probable cause and exigent circumstances. Under Payton and Oliver, therefore, absent probable cause and exigent circumstances, [the defendant]'s warrantless arrest, although not occurring in his home, was unlawful if his fenced-in backyard falls within the curtilage of his home.
Id. at 183. We went on to conclude that the fenced-in backyard constituted curtilage of the home, thereby warranting the Fourth Amendment's protection against warrantless entry for arrest. Id. at 184. Other states and federal courts are in accord with this approach, holding that an arrest occurring outside of the home may be unlawful depending upon the nature of the area in question. See, e.g., United States v. Struckman, 603 F.3d 731, 739 (9th Cir. 2010) (recognizing that curtilage garners the home's protection against warrantless entry for arrest); United States v. Brown, 510 F.3d 57, 64 (1st Cir. 2007) (conducting curtilage analysis with respect to driveway and noting the principles applicable to driveways when determining whether resident was arrested in violation of protection against warrantless entry); State v. Lewis, 675 N.W.2d 516, 523-26 (Iowa 2004) (conducting curtilage analysis for an unsecured driveway in determining whether defendant was arrested in violation of Fourth Amendment's protection against warrantless entry); State v. Karle, 759 N.E.2d 815, 819-20 (Ohio Ct. App. 2001) (holding that arrest "immediately out *85 side" of defendant's house violated Fourth Amendment); Jefferson v. Commonwealth, 497 S.E.2d 474, 480-81 (Va. Ct. App. 1998) (holding that arrest by the back door of defendant's house was unlawful); State v. Mierz, 866 P.2d 65, 70-71 (Wash. Ct. App. 1994) (holding that arrest in backyard violated Fourth Amendment).[7] We now turn to the discussion of whether the parking garage constitutes curtilage of Dumstrey's home.
*86 ¶ 32. We previously have adopted four factors set forth by the Supreme Court, United States v. Dunn, 480 U.S. 294, 301 (1987), relevant to conducting an analysis of whether an area constitutes curtilage of a home. We consider (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put[;] and" (4) "the steps taken by the resident to protect the area from observation by people passing by." Martwick, 231 Wis. 2d 801, ¶ 30 (quoting Dunn, 480 U.S. at 301). However, we do not "mechanically" apply these factors as part of a "finely tuned formula." Dunn, 480 U.S. at 301. Instead, the factors "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration — whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.
¶ 33. As indicated above, Dumstrey relies on our passing statement in Conrad that the common storage area in an apartment building's basement was "clearly within the curtilage" of the home. Conrad, 63 Wis. 2d at 633. We are not persuaded. Notably, the apartment's common storage area was not at issue in Conrad. See generally Conrad, 63 Wis. 2d 616. Rather, we held in Watkins that such an area was not protected given the lack of a reasonable expectation of privacy. Watkins, 59 Wis. 2d at 514-15. In Conrad, we engaged in no *87 analysis of why such an area would "clearly" constitute curtilage. See Conrad, 63 Wis. 2d at 633. Additionally, it is important to note that this statement in Conrad was prior to the Supreme Count's delineation of the Dunn factors. Therefore, we decline to rely upon this passing remark in Conrad to support the proposition that a common area beneath an apartment building constitutes curtilage of the home. Rather, we consider the Dunn factors as set forth by the Supreme Court.
a. proximity to the home
¶ 34. First, we look to the proximity of the parking garage to Dumstrey's home. The United States Court of Appeals for the First Circuit has held that, in an apartment building, "a tenant's [home] cannot reasonably be said to extend beyond his [or her] own apartment and perhaps any separate areas subject to his [or her] exclusive control." United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976). We tend to agree.
¶ 35. It is important to distinguish between the apartment building and Dumstrey's actual home. While the parking garage is located directly beneath the entire apartment building, it does not follow that it is therefore closely proximate to Dumstrey's home. His home cannot reasonably be said to constitute the entire apartment building. Rather, Dumstrey occupies only one of the 30 units located within the building. This is a far cry from a single family home's attached garage, which courts have consistently held constitutes curtilage. See State v. Davis, 2011 WI App 74, ¶ 12, 333 Wis. 2d 490, 798 N.W.2d 902 (collecting cases and citing State v. Leutenegger, 2004 WI App 127, *88 ¶ 21 n.5, 275 Wis. 2d 512, 685 N.W.2d 536 (recognizing that cases consistently "hold that an attached garage is part of the curtilage")).
¶ 36. In such cases, the garage is quite literally attached to the resident's home itself. For example, in Davis, 333 Wis. 2d 490, ¶ 3, the garage was attached to the resident's single family trailer home by a connecting foyer. The court of appeals accepted the garage's characterization as curtilage, and noted that "[t]he extent of the curtilage depends upon the nature of the premises, and might be interpreted more liberally in the case of a rural single-owner home, as opposed to an urban apartment." Id., ¶ 9; see also State v. O'Brien, 223 Wis. 2d 303, 316, 588 N.W.2d 8 (1999) (acknowledging importance of rural setting in determining that car parked 200 feet away from home was located on curtilage).
¶ 37. In Dumstrey's case, the garage is not similarly attached to his home itself but, rather, his home could be located anywhere within the entire 30-unit apartment building. Dumstrey takes an elevator from the parking garage, potentially up several levels, to gain access to the floor on which his home is located. We do not consider this to be closely proximate for Fourth Amendment purposes. Surely, his 29 fellow tenants would not consider their individual apartments to be a part of Dumstrey's home, and Dumstrey could not reasonably contend otherwise.
b. enclosure surrounding the home
¶ 38. Second, we consider whether the parking garage is included within an enclosure that also surrounds Dumstrey's home. According to testimony, the parking garage is located within the same overall *89 structure as the apartment building in which Dumstrey's home is located. Tenants may gain direct access to the parking garage through a door located within the apartment building. From there, tenants have access to an elevator that allows them more convenient entry to their individual homes.
¶ 39. That the parking garage is included within the enclosure of the entire apartment building could tend to favor the garage being part of his home's curtilage. However, we note that, under this same rationale, Dumstrey's 29 fellow tenants' apartments are likewise included within the same enclosure as his own apartment. As indicated above, it cannot reasonably be contended that each of these tenants' homes constitutes part of Dumstrey's home for purposes of the Fourth Amendment. Therefore, we are not persuaded by the parking garage being included within the overall enclosure that encompasses the entire apartment building.
c. nature of use
¶ 40. Next, we look to the nature of the uses to which Dumstrey puts the parking garage. The overall curtilage inquiry is directed at protecting "the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." Oliver, 466 U.S. at 180 (internal quotation marks and citation omitted).
¶ 41. Dumstrey relies on the dissent from the court of appeals decision, suggesting that he utilizes the parking garage in the same manner as other Wisconsinites use attached garages on their single family homes. Dumstrey, 359 Wis. 2d 624, ¶ 23 (Reilly, *90 J., dissenting). Namely, Dumstrey parks his car in the parking garage in order to be free from the elements, including frigid winters. Id. The dissent from the court of appeals characterizes this use as one associated with the "privacies of life." Id. However, to the contrary, courts seem overwhelmingly to hold that parking alone constitutes a use associated with neither an intimate activity of the home nor a privacy of life. See, e.g., Mack v. City of Abilene, 461 F.3d 547 (5th Cir. 2006) (collecting cases and indicating that common parking area is not a use associated with curtilage of home); Commonwealth v. McCarthy, 705 N.E.2d 1110 (Mass. 1999) (noting that regular and intended use for tenant parking does not give rise to curtilage designation); State v. Harnisch, 931 P.2d 1359, 1364 (Nev. 1997) (holding that parking in designated parking space open to view does not constitute " 'intimate activities of the home' or the 'privacies of [] life' "), disapproved of on other grounds by State v. Lloyd, 312 P.3d 467 (Nev. 2013); State v. Williford, 767 S.E.2d 139, 142-43 (N.C. Ct. App. 2015) (collecting parking lot cases).
¶ 42. The uncontroverted testimony establishes that Dumstrey utilizes the parking garage solely for parking his vehicle. He puts the area to no other use such as storing personal belongings in an exclusively controlled area or conducting other personal activities such as we would equate with a garage attached to a single family home. While we conclude that Dumstrey's use does not warrant curtilage designation, we do not foreclose the possibility that some additional use of a somewhat comparable garage could constitute a use associated with intimate activity of the home or privacy of life.
*91 d. protection from observation
¶ 43. Finally, we look to the steps Dumstrey has taken to protect the parking garage from observation by passersby within the garage. Dumstrey asserts that the entire parking garage is generally not open to the public since it is enclosed and accessible only through either the remote controlled garage door or the locked door on the inside of the apartment building. He contends that, since he pays for his assigned parking place in the garage, he has taken affirmative steps to protect the area from observation by people passing by the apartment building and enclosed garage.
¶ 44. The relevant inquiry, however, is not whether the parking garage is generally shielded from the public at large. Rather, we are concerned with whether Dumstrey has taken steps to shield the parking area from the view of passersby within the parking garage. As the Supreme Court of Massachusetts has noted with respect to an apartment building's enclosed parking area, "it is an enclosure encompassing a common area utilized by all the tenants and visitors of the building." McCarthy, 705 N.E.2d at 1113. In holding that such an enclosed parking area did not constitute curtilage of the home, the court noted that there was nothing preventing anyone entering the lot from observing the individual parking places. Id. Therefore, no steps were taken to protect the vehicle or the parking place from observation. See id.
¶ 45. Similarly, all of Dumstrey's 29 fellow tenants and their guests are free to enter the parking garage. Upon their entrance, Dumstrey cannot prevent such individuals from observing the parking area within the interior of the parking garage. Each day, *92 countless tenants are not only free to, but are required to, pass through the parking garage in order to get from their own vehicles to the elevator to access their homes. Of course, this is in addition to any visitors of the 29 other tenants or of the landlord. Consequently, Dumstrey has simply taken no steps to protect the parking garage from observation by passersby within the garage.
¶ 46. The foregoing factors do not weigh in favor of curtilage designation. Accordingly, we conclude that the parking garage is not so intimately tied to Dumstrey's home that it warrants Fourth Amendment protection as curtilage of his home. We now proceed to determine whether Dumstrey harbors a reasonable expectation of privacy in the parking garage for some other reason, such that it warrants Fourth Amendment protection against warrantless entry for arrest. See Olson, 495 U.S. at 95.
2. Reasonable expectation of privacy
¶ 47. To make this determination, we consider two questions: (1) whether the person exhibits an actual, subjective expectation of privacy in the area; and (2) whether society is willing to recognize such an expectation as reasonable. Smith v. Maryland, 442 U.S. 735, 740 (1979); State v. Rewolinski, 159 Wis. 2d 1, 13, 464 N.W.2d 401 (1990); State v. Eskridge, 2002 WI App 158, ¶ 11, 256 Wis. 2d 314, 647 N.W.2d 434. The ultimate inquiry depends on the totality of circumstances. Rewolinski, 159 Wis. 2d at 17. In answering these questions, we have identified six factors as relevant: "(1) whether the defendant had a property interest in the premises; (2) whether he [or she] was *93 legitimately (lawfully) on the premises; (3) whether he [or she] had complete dominion and control and the right to exclude others; (4) whether he [or she] took precautions customarily taken by those seeking privacy; (5) whether he [or she] put the property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy." Id. at 17-18; Eskridge, 256 Wis. 2d 314, ¶ 15.
¶ 48. We are satisfied that the first two factors cut in favor of Dumstrey's reasonable expectation of privacy. Specifically, Dumstrey has a personal property interest in his parking place in the garage because he lives in the apartment building and pays for his assigned parking location. There is likewise no dispute over whether Dumstrey was lawfully on the premises. He opened the garage door with his remote controlled opener and parked his vehicle in his assigned place prior to being seized by Officer Dejaríais. The remaining factors, however, are not similarly helpful to Dumstrey.
¶ 49. Dumstrey has shown no dominion and control over the parking garage. As set forth above, he has no right to exclude the 29 other tenants or their guests, all of whom have the same right of access as he. This is the antithesis of dominion and control over the premises. Moreover, while the parking garage is shielded from the public at large, he has taken no precautions to seek privacy within the garage from the countless strangers that could be present daily. Additionally, Dumstrey puts the garage to no use in addition to parking his vehicle. With the 29 other tenants putting the garage to this same use, Dumstrey's use can in no way be considered "private." Finally, we are convinced that historical notions of privacy are simply not con *94 sistent with such a large number of people having the same right of access to the parking garage as Dumstrey himself. "[Cjommon areas in apartment buildings are, by their very definition, not private but shared areas, accessible to and used by other tenants." Eskridge, 256 Wis. 2d 314, ¶ 19.
¶ 50. Under the totality of circumstances, we doubt that Dumstrey harbors any actual expectation of privacy in the parking garage, and if he does, such an expectation is surely not reasonable. However, we do not foreclose the possibility that a person may exhibit a reasonable expectation of privacy in a smaller, more intimate multi-unit dwelling. See State v. Trecroci, 2001 WI App 126, ¶ 40, 246 Wis. 2d 261, 630 N.W.2d 555 (distinguishing between large apartment complex and a smaller apartment house for purposes of reasonable expectation analysis).
IV. CONCLUSION
¶ 51. In light of the foregoing, we conclude that the parking garage underneath this apartment building does not constitute curtilage of Dumstrey's home. We further conclude that Dumstrey has shown no reasonable expectation of privacy in the garage. Consequently, Dumstrey's stop and subsequent arrest in the garage did not violate the Fourth Amendment's prohibition against unreasonable seizures. Stated otherwise, the seizure did not occur after a warrant-less entry into a constitutionally protected area. Accordingly, we affirm the decision of the court of appeals.
By the Court. — The decision of the court of appeals is affirmed.
¶ 52. Rebecca G. Bradley, J., did not participate.

 State v. Dumstrey, 2015 WI App 5, 359 Wis. 2d 624, 859 N.W.2d 138.

 The Honorable Donald J. Hassin, Jr. of Waukesha County presided.

 All further references to the Wisconsin Statutes are to the 2013-14 version, unless otherwise indicated.

 One judge dissented, indicating that he would hold that the parking garage constituted both curtilage and an area protected by a reasonable expectation of privacy. Dumstrey, 359 Wis. 2d 624, ¶ 18.

 However, after Dumstrey was arrested, a search occurred when he consented to the blood draw at the hospital. As Dumstrey does not challenge the blood draw on McNeely grounds, we need not address it. Missouri v. McNeely, _ U.S. __, 133 S. Ct. 1552 (2013) (discussing Fourth Amendment protections from nonconsensual, warrantless blood draw).

 Similarly, in State v. Martwick, 2000 WI 5, ¶ 31 n.13, 231 Wis. 2d 801, 604 N.W.2d 552, we stated that "the privacy issue is interwoven with the curtilage determination and need not be considered separately." While it may be true that the two inquiries sometimes overlap, this approach may not accurately relate the current state of the law. *86 tana, see State v. Walker, 154 Wis. 2d 158, 184 n.16, 453 N.W.2d 127 (1990), Dumstrey's case does not present the proper factual scenario for us to define these specific contours today.

 We recognize that there may be an eventual difficulty in reconciling the notion that curtilage is afforded the same protections as the home against warrantless entry for arrest with the Supreme Court's holding in United States v. Santana, 427 U.S. 38 (1976). In Santana, the resident of a home was initially seen by police while standing in the doorway of her home, which the Court characterized as a "public place" because she was "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." Id. at 42. The police had probable cause to arrest the resident prior to seeing her in the doorway and began to approach her, at which time she "retreated into the vestibule of her house." Id. at 40. The police followed the resident into her house and arrested her. Id. at 40-41. The Court held that, since the police initially saw the resident standing in a "public place" and then hotly pursued her into the home, the in-home arrest was justified by exigent circumstances. Id. at 42-43. Santana is a seizure case.
In spite of the Supreme Court's characterization of the front doorway as a "public place" without any reference to curtilage, the Supreme Court also has stated that the front porch is the "classic exemplar" of a home's curtilage. Florida v. Jardines, _ U.S. _, 133 S. Ct. 1409, 1415 (2013). Jardines is a search case. This causes us to wonder whether there may be instances in which an area constitutes constitutionally protected curtilage for one purpose, such as a warrantless search, while not for another purpose, such as a warrantless arrest.
While we note this interesting dichotomy and recognize that there may be potential difficulty in reconciling Walker's protection against warrantless arrest on curtilage with San-