GUNDRUM, J.[1]
¶1 The State appeals from a circuit court order granting Steven D. Palmersheim's motion to suppress evidence. For the following reasons, we reverse.
Background
¶2 Palmersheim was arrested for operating a motor vehicle while intoxicated and subsequently charged with OWI, second offense. He filed a motion to suppress evidence, and the circuit court held an evidentiary hearing at which the arresting officer and Palmersheim were the only witnesses to testify. Their relevant testimony is as follows.
¶3 The officer testified that around 5:00 p.m. on September 25, 2017, dispatch informed him that a witness reported following a vehicle that was "all over the road." The witness identified the suspect vehicle and also provided his own name and a description of the vehicle he was driving. The officer responded to the home of the registered owner of the suspect vehicle, which home was in "a residential neighborhood with nothing but homes and residences surrounding it." Here, the officer first encountered the witness, who pointed to the red Ford Ranger parked in front of his vehicle. The witness informed the officer that he had remained in visual contact of the Ranger and observed the driver-Palmersheim-exit the vehicle and stand next to it, "sway[ ] side to side," and urinate.
¶4 The officer observed Palmersheim walk from the Ranger up the driveway towards the open garage attached to his home. The officer first attempted to speak with Palmersheim by stating something like, "[E]xcuse me, sir, can I talk to you." When Palmersheim did not respond, the officer "yelled" for him to stop. Palmersheim "did turn around and look" at the officer who was approximately thirty feet away in his "full police uniform and ... in proximity of [his] fully marked patrol car." After looking at the officer, Palmersheim turned and continued into the garage. The officer "briskly walked and hustled up to try to catch up" to Palmersheim. In the garage and near the door leading into his residence, Palmersheim "hit the button ... and started lowering the garage door," at which time the officer placed his foot in a position to and did "br[eak] the beam" at the bottom of the entryway to the garage, which caused the garage door to "retract back to the up position." The officer did this because he "wanted to continue to contact Mr. Palmersheim."
¶5 Palmersheim opened the door to enter his home, but as the garage door went back up, the officer, "still standing in the threshold of the garage,"[2] asked Palmersheim: "[S]ir, can you please come out of the garage. Can you step out here and talk to me." Palmersheim complied by coming out of the garage and onto the driveway. The officer observed a "strong odor of intoxicants" coming from Palmersheim; his eyes, which were glassy and bloodshot, were "only about halfway open"; he was "kind of swaying side to side"; his speech was "very slurred"; and he "had a hard time completing sentences and putting thoughts together." When questioned by the officer, Palmersheim denied driving recklessly or urinating next to his vehicle. The officer turned and looked at the Ranger and noticed "a stream coming from underneath [Palmersheim's] vehicle which would have come from the area of the driver's door of his vehicle into the gutter curb area." The officer agreed this was consistent with somebody urinating near the vehicle. Palmersheim again denied urinating and then refused the officer's request that he perform field sobriety testing.
¶6 Palmersheim started to walk back into the garage, at which point the officer "made contact" with his arm and prevented him from going into the home. Palmersheim came back out of the garage and appeared as if he would cooperate with performing field sobriety tests, but when the officer asked him again if he would, Palmersheim did not answer. The officer interpreted this as Palmersheim refusing to perform the tests. The officer placed him under arrest for OWI. The officer also issued him a citation for disorderly conduct for urinating in the street.
¶7 Upon cross-examination, the officer expressed that by "briskly walking" toward Palmersheim to prevent him from entering his residence, he was "chasing" Palmersheim in "hot pursuit" for urinating in the street. The officer added that he "certainly stepped up [his] pace to catch up" to Palmersheim although "[t]he distance wasn't that far." Upon questioning by the court regarding why he stopped at the threshold of the garage if he was in hot pursuit, the officer explained that he "wanted to persuade [Palmersheim] to come back out. I didn't feel it was safe to follow" him into the home or even the garage.
¶8 Palmersheim testified that when the officer first asked him to stop, Palmersheim had already crossed the threshold into his garage. On cross-examination, Palmersheim agreed that his memory of the event could be "a little hazy" due to having consumed sufficient alcohol to result in a .23 blood alcohol concentration level, based upon subsequent testing.
¶9 The circuit court determined the officer had probable cause to arrest Palmersheim for obstructing an officer-due to Palmersheim turning away from the officer and continuing toward his home after the officer had told him to stop. It also concluded, however, that no exigent circumstances-specifically no "hot pursuit"-existed to legally justify the officer's warrantless entry into Palmersheim's garage by placing his foot into the garage to break the safety beam. The court granted Palmersheim's motion to suppress, and the State appeals from that order.
Discussion
¶10 The parties agree the officer committed a warrantless entry under the Fourth Amendment when he placed his foot into the garage to break the safety beam. See State v. Dumstrey , 2016 WI 3, ¶¶ 23, 35, 366 Wis. 2d 64, 873 N.W.2d 502 (recognizing that a garage attached to a home constitutes Fourth Amendment protected curtilage); State v. Davis , 2011 WI App 74, ¶ 12, 333 Wis. 2d 490, 798 N.W.2d 902 ; see also State v. Johnson , 177 Wis. 2d 224, 231-32, 501 N.W.2d 876 (Ct. App. 1993) (holding that the officer's "step into the threshold, preventing Johnson from closing the door, was an entry"). For purposes of this decision, we assume, without deciding, that that is correct.
¶11 To legally justify this warrantless entry, the officer would have had to have had probable cause that Palmersheim had committed a jailable offense, and exigent circumstances-in this case, that the officer was engaged in "hot pursuit" at the time he breached the garage entryway-would have had to have existed. See State v. Weber , 2016 WI 96, ¶¶ 19, 25, 372 Wis. 2d 202, 887 N.W.2d 554. The State contends the circuit court correctly determined the officer had probable cause to arrest Palmersheim at that time but incorrectly determined the officer was not in hot pursuit of him. Palmersheim contends there was neither probable cause nor a hot pursuit. The State is correct.
¶12 "When we review a circuit court's ruling on a motion to suppress evidence, we apply the clearly erroneous standard to the circuit court's findings of fact. However, we review the circuit court's application of constitutional principles to the findings of fact de novo." State v. Smiter , 2011 WI App 15, ¶ 9, 331 Wis. 2d 431, 793 N.W.2d 920 (2010) (citations omitted).
Probable Cause
¶13 The State contends that when the officer stuck his foot into the garage he had probable cause to arrest Palmersheim for violating the criminal offenses of resisting/obstructing an officer and disorderly conduct. Palmersheim claims there was no probable cause. Probable cause
is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime. There must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not.
Weber , 372 Wis. 2d 202, ¶ 20 (citation omitted). "The test to determine probable cause is objective and requires an examination of the totality of the circumstances. Further, 'probable cause eschews technicality and legalisms in favor of a flexible, common-sense measure of the plausibility of particular conclusions about human behavior.' " Id. (citations omitted).
¶14 To convict a person of a Class A misdemeanor, i.e., criminal/jailable, offense of resisting or obstructing an officer, the State must prove: (1) the defendant resisted or obstructed an officer, (2) the officer was doing an act in an official capacity, (3) the officer's action was being done with lawful authority, (4) the defendant knew the officer was acting in an official capacity, (5) the defendant knew the officer was acting with lawful authority, and (6) the defendant's conduct constituted resistance or obstruction of the officer. See WIS. STAT. § 946.41(1) ; WIS JI-CRIMINAL 1766; State v. Lossman , 118 Wis. 2d 526, 536, 348 N.W.2d 159 (1984). The issue on appeal is not whether a jury would find that each of these elements was met beyond a reasonable doubt but whether the officer had probable cause to arrest Palmersheim for committing the offense of resisting/obstructing the officer prior to the officer's breach of the entryway to Palmersheim's garage.
¶15 Prior to sticking his foot into the garage, the officer had attempted to speak with Palmersheim by stating to him something like, "[E]xcuse me, sir, can I talk to you." When Palmersheim did not respond, the officer "yelled" for him to stop. Palmersheim turned around and looked at the officer, who was approximately thirty feet away in his "full police uniform and ... in proximity of [his] fully marked patrol car." Palmersheim then turned and continued into the garage and toward the door leading into his house.
¶16 Related to the first three elements, Palmersheim's act of turning away from the officer and continuing to head into his garage and toward the door leading into his house, despite having apparently heard the officer's command for him to stop, would lead a reasonable officer to believe Palmersheim probably had rebuffed the officer's command and was in the process of at least resisting, if not obstructing, the officer (first element). The officer was on duty as a police officer and investigating an OWI offense and thus acting in his official capacity (second element). The reliable witness[3] had indicated to dispatch and the officer collectively that Palmersheim had been "all over the road," was swaying side to side upon exiting his vehicle, and urinated next to the parked Ranger. With this, the officer had reasonable suspicion that Palmersheim had been operating his vehicle while intoxicated and probable cause to arrest him for committing disorderly conduct. See infra ¶ 18. Thus, the officer had lawful authority to stop Palmersheim for further OWI and/or disorderly conduct investigation and even arrest him, based upon probable cause, for the latter offense (third element).[4]
¶17 As for the remaining three elements, the officer testified it was "day time," "kind of mid afternoon around 5 p.m." in September when Palmersheim, in response to the officer's command for him to stop, turned around and looked at the officer, who was in his "full police uniform and ... in proximity of [his] fully marked patrol car." This would lead a reasonable officer to believe Palmersheim probably knew the officer was acting in his official capacity (fourth element). Palmersheim then turned away from the officer and continued proceeding toward the door to his residence inside the garage and hit the button to lower the garage as the officer was "briskly walk[ing] ... up to try to catch up to him." All of this would lead a reasonable officer to believe Palmersheim probably knew the officer was acting with lawful authority (fifth element). And all of these facts together would lead a reasonable officer to believe Palmersheim probably knew his conduct constituted resisting or obstructing an officer-this officer who had just communicated his desire to speak with Palmersheim, who just finished urinating on a public street, and when a friendlier approach did not work, commanded him to stop (sixth element). We agree with the circuit court that when the officer stuck his foot into Palmersheim's garage, he had probable cause to arrest Palmersheim for resisting/obstructing an officer.[5]
¶18 As indicated, we also conclude that prior to sticking his foot into Palmersheim's garage the officer had probable cause to arrest Palmersheim for violating WIS. STAT. § 947.01, disorderly conduct-a Class B misdemeanor, a jailable offense. This offense is committed by a person who "in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." Id. Here, the officer had information from the reliable witness that Palmersheim had just urinated on a public street, and the officer himself observed that it was "day time" and the location of this act was in "a residential neighborhood with nothing but homes and residences surrounding it." Palmersheim's act of urinating in fact was visible to a member of the public, the reliable witness,[6] and likely could have been observed by others in this residential neighborhood. As part of the act of urinating, it also certainly would be reasonable for the officer to infer that Palmersheim had exposed his genitalia, at least to some extent and in some way, in order to execute the act. Again, whether Palmersheim would have been convicted at trial of disorderly conduct we cannot say, nor is that the question. The required standard-probable cause-existed to arrest him for engaging in "indecent ... or otherwise disorderly conduct under circumstances [which tended] to cause or provoke a disturbance" because of his conduct of urinating on a public street during the "day time" and in a residential neighborhood where the public would be able to, and in this case in fact did, observe him doing so. See § 947.01 ; State v. Neff , No. 2010AP1092-CR, unpublished slip op. at ¶ 12 (WI App Nov. 10, 2010) (noting that the anonymous tip in that case "contain[ed] an assertion of criminal activity: urinating in public"); see also Negron v. State , 979 A.2d 1111, at *4 (Del. 2009) (unpublished table decision) (concluding that "public urination may constitute 'a hazardous or physically offensive condition which serves no legitimate purpose' within the meaning of the [disorderly conduct] statute" (citation omitted) ); State v. Villarreal , 984 P.2d 1064, 1067 (Wash. Ct. App. 1999) ("Urinating in public may constitute either 'vulgar' conduct, as being particularly coarse or crude, or the disposal of an 'offensive' substance" and thus constitutes disorderly conduct. (citation omitted) ); People v. Duncan , 631 N.E.2d 803, 804 (Ill. App. Ct. 1994) ("urination in public ... can be done in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace").
Hot Pursuit
¶19 The State and Palmersheim also dispute whether the officer was engaged in hot pursuit when he stuck his foot into the garage. We conclude he was.
¶20 " '[H]ot pursuit' is established 'where there is an immediate or continuous pursuit of [a suspect] from the scene of a crime.' " State v. Richter , 2000 WI 58, ¶ 32, 235 Wis. 2d 524, 612 N.W.2d 29 (second alteration in original; citations omitted); Weber , 372 Wis. 2d 202, ¶ 28. In this case, as indicated, at the time Palmersheim turned away from the officer and continued heading toward his home, the officer had probable cause to arrest him for disorderly conduct and resisting/obstructing an officer. This action by Palmersheim prompted the officer to "certainly step[ ] up [his] pace" and begin "briskly walk[ing]" and "hustl[ing] up" to try to catch up to Palmersheim before he could escape into his house. We find the United States Supreme Court's decision in United States v. Santana , 427 U.S. 38 (1976), and the Wisconsin Supreme Court's decision in Weber , 372 Wis. 2d 202, to be instructive on the hot pursuit question.
¶21 In Santana , Santana was standing in the doorway to her home when officers, who had probable cause to arrest her for committing a drug-related crime, pulled up about fifteen feet from her. Santana , 427 U.S. at 39-40. As officers approached, Santana "retreated into the vestibule of her house." Id. at 40. The officers followed her into, and caught her in, the vestibule. Id.
¶22 The Court noted that in United States v. Watson , 423 U.S. 411 (1976), it had "held that the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment." Santana , 427 U.S. at 42. The Court stated that its first question then was whether Santana was "in a public place" when the police first sought to arrest her. Id. On this point, the Court stated: "While it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a 'public' place," and "[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection."Id. (citation omitted). The Court noted that Santana "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. Thus, when the police ... sought to arrest her, they merely intended to perform a function which we have approved in Watson ." Santana , 427 U.S. at 42 (citation omitted). The Court then concluded that Santana could not "thwart an otherwise proper arrest" through the act of "retreating into her house." Id. The Court further added that "[t]he fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house." Id. at 43.
¶23 In the case now before us, the officer had probable cause to arrest Palmersheim for disorderly conduct as soon as the reliable witness informed the officer he had observed Palmersheim urinate on the public street in daytime in a residential area and in view of the witness. The record indicates Palmersheim was in the process of walking from his parked vehicle on the street to his garage when the officer first attempted to stop him for investigation. Furthermore, as the circuit court implicitly found, Palmersheim was still on his driveway outside of the garage when he refused to heed the officer's command for him to stop and, in doing so, provided probable cause to arrest him for resisting/obstructing an officer, in addition to the already-existing probable cause to arrest him for disorderly conduct.[7] The officer then advanced "briskly" toward the garage "to try to catch up to" Palmersheim as Palmersheim proceeded into the garage and toward the door to his house. As the officer approached the garage, Palmersheim was inside of it near the door leading into the house. Palmersheim then hit the button to close the garage door. The officer stuck out his foot to break the safety beam at the bottom and make the door retract up, which it did. It is at this point the officer committed the warrantless entry, so it is at this point that, having determined he had probable cause to arrest Palmersheim at this time, we consider whether he also had been in hot pursuit of Palmersheim. We conclude he had been.
¶24 As stated, Palmersheim had just provided probable cause to arrest him for the additional crime of resisting/obstructing an officer, and the officer's response was to "step[ ] up [his] pace" to "briskly" advance toward Palmersheim to prevent him from escaping into his home. Palmersheim could no more "thwart an otherwise proper arrest" by his act of "retreating into [his] house" than could Santana. See id. at 42. And, like in Santana , "[t]he fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into" Palmersheim's garage. See id. at 43. Within the particular context of this case, where Palmersheim, as far as we can tell from the record, did not run from the officer but nonetheless continued to steadily advance closer to the escape of his abode, and even attempted to close the garage door, which obviously would have aided his escape, the officer's pursuit of Palmersheim was "immediate" and "continuous" and amounted to a hot pursuit tailored to prevent Palmersheim's escape under these circumstances. See Weber , 372 Wis. 2d 202, ¶28.
¶25 The facts in Weber bear much similarity to those in this case. Like the officer in this case commanding Palmersheim to stop, the deputy in Weber activated his emergency lights to effectuate a traffic stop of Weber after observing a broken brake lamp on his vehicle and the vehicle weave over the fog line. Id. , ¶ 4. Weber drove about 100 feet more before turning into his driveway and driving into the garage attached to his home. Id. The deputy parked about fifteen to twenty feet behind Weber with his emergency lights still activated. Id. Weber and the deputy exited their vehicles nearly simultaneously, and Weber proceeded toward a door leading into his house. Id. , ¶5. The deputy ran toward Weber telling him to stop and that the deputy needed to speak with him. Id. Weber continued up the steps toward the house, prompting the deputy to enter the garage and grab Weber's arm just as he had entered the house. Id. Subsequent investigation led to various criminal charges. Id. , ¶¶ 6-10.
¶26 Reviewing rulings on a motion to suppress by Weber, our supreme court concluded that the deputy "was indeed engaged in 'immediate or continuous pursuit of [a suspect] from the scene of a crime.' " Id. , ¶ 36 (alteration in original; citation omitted). The court noted that the deputy "was attempting to apprehend Weber, who was fleeing [the deputy's] lawful traffic stop on a public highway. There was no delay between Weber's illegal actions and [the deputy's] pursuit of Weber." Id. The court also expressed that the deputy's entry and apprehension of Weber
were calculated to accomplish no more than was absolutely necessary to halt Weber's escape. Additionally, the entry was a last resort. [The deputy] had already attempted to stop Weber by activating his emergency lights and calling after him; it was due to Weber's actions that [the deputy] was forced to enter the garage to accomplish the stop. Finally, [the deputy] ended the intrusion promptly, staying in the garage no longer than needed.
Id. , ¶ 38.
¶27 Here, Palmersheim's criminal conduct of resisting/obstructing an officer immediately led the deputy to "step[ ] up [his] pace" and "briskly" advance to try and prevent Palmersheim's escape. The officer's action of deliberately causing the garage to retract up by breaking the safety beam with his foot was an act in full continuation of his pursuit of Palmersheim. As in Weber , the officer's actions here "were calculated to accomplish no more than was absolutely necessary to halt" Palmersheim's escape. The officer simply placed his foot across the safety beam at the entryway into the garage-at that point the officer had not even entered the garage with his full body, as the deputy in Weber had done. Indeed, the deputy even greatly minimized the intrusion at this point by immediately and tactfully coaxing Palmersheim to come out of the garage, instead of fully entering therein and grabbing Palmersheim. And, it was Palmersheim's actions of apparently intentionally resisting the officer's lawful command to stop, continuing toward the door leading into the house, and attempting to close the garage door as the officer approached that forced the officer to break the beam at the garage entryway to try to prevent Palmersheim's escape.[8]
¶28 Whether a pursuit of a criminal suspect is a "hot" pursuit depends on the particular circumstances of each case. If a suspect is speeding away in a vehicle, hot pursuit will no doubt involve an officer following the suspect in a vehicle, quite possibly, but not necessarily, at a high rate of speed. If a suspect is running through back yards and alleys attempting to escape from an officer, the officer will likely need to engage in a hot-pursuit foot race requiring speeds near that of a sprint. If the pursuit goes longer, that sprint may turn to a more paced foot race, yet still be a hot pursuit. If an officer is pursuing a suspect and the suspect tries to close a door, garage door or otherwise, to prevent apprehension, hot pursuit will necessarily include preventing the door from being closed.
¶29 In this case, there is no indication Palmersheim ran from the officer, so hot pursuit could be accomplished by the officer "stepp[ing] up [his] pace" to "briskly walk[ing] and hustl[ing] up" to try to catch Palmersheim. The officer then stopped the closing of the garage door as part of his pursuit. The manner in which the officer engaged in hot pursuit was appropriately measured to the manner Palmersheim used to try to evade the officer. Once he foiled Palmersheim's effort to close the garage door, the officer succeeded in his hot-pursuit objective of stopping Palmersheim's escape into his home by persuading Palmersheim to exit the garage. This proved as effective as if the officer had fully invaded Palmersheim's curtilage/garage and grabbed Palmersheim by the arm, similar to what occurred in Weber , yet without creating a safety risk for the officer.[9] At the moment the officer's foot entered the garage and stopped the garage door from closing-the warrantless entry-the officer was in hot pursuit of Palmersheim.
¶30 Palmersheim cites to the United States Supreme Court's recent decision in Collins v. Virginia , 584 U.S. ----, 138 S. Ct. 1663 (2018), for the proposition that "[w]hen a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." Id. at 1670. Palmersheim then suggests the officer in this case violated his Fourth Amendment rights because he "intruded onto [his] driveway to detain and question him about a civil law violation." The officer did not err.
¶31 In Collins , the Court held that the particular part of a driveway where an officer conducted a warrantless search of a motorcycle was curtilage entitled to Fourth Amendment protection from such a search. Id. , 138 S. Ct. at 1671. That part was inside of a "partially enclosed top portion of the driveway that abuts the house," id. at 1671, "beyond where a neighbor would venture, in an area 'intimately linked to the home, ... where privacy expectations are most heightened,' " id. at 1673 n.3 (citation omitted). The court likened the area to "the front porch, side garden, or area 'outside the front window.' " Id. at 1671 (citation omitted).
¶32 By contrast, the evidentiary hearing transcript in this case indicates that the officer was "[p]robably in the area of the sidewalk"-not far up Palmersheim's driveway near his home-when the officer first politely, and then through a command, attempted to stop Palmersheim.[10] Thus, the officer's location when he ordered Palmersheim to stop was not in an area of curtilage and bears no similarity to the location of the officer in Collins . When the officer here then "stepped up [his] pace" and began to "briskly walk[ ] and hustle[ ] up to try to catch up" to Palmersheim, the officer had probable cause that two criminal offenses had been committed and he was engaged in hot pursuit of Palmersheim, who at that point was approximately thirty feet away from the officer and fleeing at his own pace.
¶33 "The 'touchstone of the Fourth Amendment is reasonableness,' and '[r]easonableness ... is measured in objective terms by examining the totality of the circumstances.' " Weber , 372 Wis. 2d 202, ¶ 34 (quoting Ohio v. Robinette , 519 U.S. 33, 39 (1996) ). The officer's actions in this case satisfied that touchstone.
¶34 For the foregoing reasons, we reverse and remand for further proceedings.
By the Court. -Order reversed and cause remanded.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(f) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The officer's right foot was in the garage and left foot was on the driveway, outside of the garage.

The circuit court determined the witness who reported Palmersheim's disturbing driving was reliable. Having followed and provided identification of Palmersheim's Ranger, provided his own personal identifying information, and even remained on the scene behind Palmersheim's vehicle when the officer arrived, we agree the witness was reliable. We do not analyze the question any more extensively, however, because Palmersheim does not contest on appeal the reliability of the witness.

We agree with the State that the officer had reasonable suspicion that Palmersheim had been operating while intoxicated, but do not discuss this further since Palmersheim does not dispute this.

We pause here to note that probable cause of resisting an officer appears to be even stronger in this case than probable cause of fleeing or resisting an officer was in State v. Weber , 2016 WI 96, 372 Wis. 2d 202, 887 N.W.2d 554, a case we address more later. In Weber , the lead opinion concluded that probable cause existed that Weber was "knowingly resist[ing]," see Wis. Stat. §§ 346.04(2t) and 946.41(1) (both requiring "knowing[ ] resist[ance]" by a suspect) and Weber , 372 Wis. 2d 202, ¶¶ 10, 23 (concluding that probable cause existed to arrest Weber for a violation of §§ 346.04(2t) and 946.41(1) ), where Weber continued driving for 100 feet after the deputy activated his emergency lights, turned into his driveway, and drove into and parked in his garage, with Weber simply failing to "acknowledge"/"respond to" the deputy's attempts to stop him. Weber , 372 Wis. 2d 202, ¶¶ 5, 23, 25. In the case now before us, after the officer yelled at Palmersheim to stop, Palmersheim turned and looked at the officer, who was in his "full police uniform and ... in proximity of [his] fully marked patrol car," and then turned away from the officer and continued heading toward the entry to his home.

As opposed to, for example, a person urinating under cover of darkness in his own back yard surrounded by a privacy fence and very likely observable by no one.

The officer testified that Palmersheim was outside of the garage when the officer ordered him to stop, and Palmersheim testified that he was inside of it. The circuit court implicitly found, consistent with the officer's testimony, that Palmersheim was outside of the garage at that time, noting that after the officer ordered Palmersheim to stop, Palmersheim instead "continued to walk away into the garage."

In Weber , the three justices supporting the lead opinion in toto and Justice Daniel Kelly in his concurrence disagreed as to whether there was probable cause that Weber had unlawfully fled from the deputy following the deputy's activation of his emergency lights. Weber , 372 Wis. 2d 202, ¶¶ 23, 46. These four justices-a majority-however, did conclude that if probable cause existed, the officer's warrantless entry into Weber's garage was lawful because the "hot pursuit" doctrine permitted the officer to enter the garage to arrest Weber. Id. , ¶¶ 44, 54, 66. Justice Kelly explained, "[I]f there really is probable cause to believe this offense occurred, then it is also right that the 'hot pursuit' doctrine allowed Deputy Dorshorst to enter the garage and conduct the search and arrest of Mr. Weber. But this record discloses no probable cause." Id ., ¶54 (Kelly, J., concurring).

The officer testified:
I didn't think it was safe to go into the residence. I felt if I maintained a position at the threshold of the garage I could make contact with him and bring him back out of the garage and then interview him under my terms.
....
[W]hen somebody goes in the residence, I don't know if he has knives, guns, you know, bats or something.... I don't know his residence like he does.
He could have a shotgun sitting right inside of the door that he could then grab. I didn't see him with a weapon on him as he entered the garage when I saw him outside but it doesn't mean he couldn't access weapons once inside the residence.
....
I felt it was safer to stay at the threshold and have him come out and speak with him especially since I was on scene by myself.

Palmersheim appears at one point in his briefing to suggest the officer may have violated his Fourth Amendment rights because Palmersheim was in the curtilage of his home when the officer ordered him to stop. Assuming that to be an argument Palmersheim is suggesting, he has failed to sufficiently develop it, so we do not address it further than we already have in ¶¶ 21-24. See Clean Wis., Inc. v. PSC , 2005 WI 93, ¶ 180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."); State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").