COURT OF APPEALS
DECISION
DATED AND FILED

July 23, 2019

Sheila T. Reiff
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2018AP718-CR**

STATE OF WISCONSIN

Cir. Ct. No.  **2015CM127**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

ADAM BLAINE ANDERSON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Pierce County:  JOSEPH D. BOLES, Judge.  *Affirmed*.

¶1    HRUZ, J.[1]  Adam Anderson appeals both a judgment convicting him of resisting an officer and an order denying his motion for postconviction relief.  Anderson contends the circuit court erred in denying his motion to suppress

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18).  All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

evidence because his arrest was the result of an unlawful search by law enforcement. We affirm.

## BACKGROUND

¶2 In July 2015, deputy Marty Shepler, an investigator in the Pierce County Sheriff's Department, had been watching live surveillance video of a residence when Shepler observed Anderson in the residence's yard. Shepler recognized Anderson and knew there was an outstanding warrant for his arrest. Shepler contacted patrol deputies, who then drove to the residence to take Anderson into custody. When the sheriff's deputies arrived, Anderson fled on foot out the back of a garage and through a soybean field, where he eventually tripped and surrendered to the deputies. Following his arrest, Anderson was charged with a single count of resisting an officer, contrary to WIS. STAT. § 946.41(1).

¶3 Anderson moved to suppress "any and all evidence viewed or seized by law enforcement" on the day of his arrest. Shepler testified to the following relevant facts at the hearing on Anderson's motion to suppress.

¶4 On the day of Anderson's arrest, Shepler was viewing surveillance video of a residence suspected of housing people who were illegally trafficking methamphetamine and stolen property. The device used for surveilling the property was a camera that is "very similar to a traffic camera" and could be purchased by the general public.[2] The camera was attached to a telephone pole,

---

[2] Shepler later elaborated that the camera is "very similar to a traffic camera that you would see on the news, … if there's an accident, [individuals] can pan [the camera] over and look at the accident and see what the traffic flow is. All news media has them, they're along [Interstate]-94."

"right where the lines meet," about three to four feet down from the top of the pole. The telephone pole itself was not located on the residence's property; it was located across the street to the east and "just south" of the residence on land owned by Pierce Pepin Cooperative, an electric distribution cooperative. Shepler could view soybean fields, cornfields, the residence, trees, and the intersection of two county roads. The camera would broadcast in real time the video to Shepler's computer, and he could use the camera's zoom feature to "focus on things a couple miles away, if necessary."

¶5    The camera's primary purpose was not to locate Anderson. However, when Shepler was viewing the camera's video footage on his computer, he noticed Anderson in the yard. Shepler had not seen Anderson at the residence previously, but Shepler recognized Anderson and knew that there was an outstanding warrant for his arrest. Shepler acknowledged that he did not have a search warrant for the area that he could see with the camera—which included the residence and its yard.

¶6    The residence's yard was enclosed by an approximately six-foot-tall "see-through wire" fence that wrapped "all the way around the yard." The residence and its yard were located on the corner of two county roads. Trees lined one side of the yard, but the view into the yard—particularly from the two county roads—was otherwise unrestricted.

¶7    Anderson also testified, in part to explain why he was at the residence. The owner of the residence was Anderson's acquaintance, and Anderson had been staying overnight there for "about a week" prior to his arrest.

¶8    The circuit court denied Anderson's suppression motion. It found significant that the camera was not placed on the residence's property and that

Shepler was not looking into the house with the camera, but was "just observing the yard the same as [he] could have observed with the naked eye, it's just that the camera was there on a more constant basis."

¶9     A jury subsequently found Anderson guilty of resisting an officer. Anderson moved for postconviction relief, which the circuit court found to be, "in essence, a motion to reconsider the Court's pretrial decision on [Anderson]'s motion to suppress." The court denied Anderson's postconviction motion, and he now appeals.

**DISCUSSION**

¶10     Anderson generally argues that his arrest was the fruit of an unlawful Fourth Amendment search. He asserts that Shepler's fortuitously recognizing him in the residence's yard through Shepler's use of a camera mounted on the telephone pole constituted a search within the meaning of the Fourth Amendment. Anderson contends that the search was unreasonable because Shepler did not have a search warrant for the area within which he saw Anderson and because Anderson was within the residence's curtilage at that time.[3] In Anderson's view, his subsequent arrest would not have occurred but for Shepler's unlawful search, and the video footage should have been suppressed at his jury trial. Assuming without deciding that Anderson was within the residence's curtilage, we conclude Anderson's arrest was not the result of an unlawful search.

---

[3] The State did not address whether Anderson has Fourth Amendment standing to assert a privacy interest in the residence's yard after Anderson raised this issue in his brief-in-chief. We take the State's failure to respond to this issue as a concession that Anderson has standing to claim a Fourth Amendment violation. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979). We also note that Anderson opted not to file a reply brief in this appeal.

4

¶11     The Fourth Amendment of the United States Constitution protects people, not places, from unreasonable searches and seizures by government actors. *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018). Article 1, section 11 of the Wisconsin Constitution contains a substantively identical provision that Wisconsin courts have historically interpreted in accord with the Supreme Court's interpretation of the Fourth Amendment. *State v. Dumstrey*, 2016 WI 3, ¶14, 366 Wis. 2d 64, 873 N.W.2d 502. When an individual seeks to preserve something as private and his or her expectation of privacy "is one that society is prepared to recognize as reasonable," official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause to be lawful. *Carpenter*, 138 S. Ct. at 2213 (citation omitted).

¶12     The Supreme Court has recognized that an individual's "reasonable expectation of privacy" embodies two related, but distinct, concepts, each with its own line of case law and Court commentary. *See United States v. Jones*, 565 U.S. 400, 407-08 (2012). The first concept assesses a case's facts using principles of real or personal property law, as the Supreme Court's Fourth Amendment jurisprudence "was tied to common-law trespass," due to the Fourth Amendment's text's "close connection to property." *Id.* at 405, 408. The other concept analyzes a fact pattern using traditional societal norms by asking whether an individual's claimed expectation of privacy within a particular area would be an expectation society recognizes as reasonable. *Id.* at 408.

¶13     Again, Anderson asserts an unlawful search occurred because Shepler observed him within the residence's curtilage without first obtaining a search warrant for that area. By making this argument, Anderson seems to be implicitly asserting that he had a reasonable expectation of privacy within the residence's yard under principles of real or personal property law. *See id.* at 408

& n.5, 411 & n.8. The State responds that no search warrant was required because Anderson lacked a reasonable expectation of privacy under the second relevant concept under the law—i.e., that society would not reasonably recognize an expectation of privacy within the residence's yard.[4] We address each party's arguments in turn.

I. *Anderson had no reasonable expectation of privacy in the residence's yard under principles of real or personal property law.*

¶14 When the government "engage[s] in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *Jones*, 565 U.S. at 407. In other words, an officer cannot trespass onto a constitutionally protected area to obtain information. *Id.* at 408 n.5, 409. One's home, and its surrounding curtilage, are such constitutionally protected areas under the Fourth Amendment. *Dumstrey*, 366 Wis. 2d 64, ¶23.

¶15 Anderson's argument is scattershot, difficult to follow, and minimally developed. He simply assumes, erroneously, that an unlawful Fourth Amendment search occurred because Shepler, without a warrant, used a camera to view Anderson within the residence's curtilage (yard). Meanwhile, Anderson provides no cogent explanation as to why he had a reasonable expectation of privacy in the residence's yard based on principles of real or personal property law.

---

[4] The State also disputes that Anderson was within the residence's curtilage. As previously stated, however, we assume without deciding that Anderson was within the residence's curtilage.

¶16    When the facts are analyzed properly according to case law, however, Shepler's use of a camera to see Anderson within the residence's yard was not an unlawful search under real or personal property law. Neither Shepler, nor any other officer, gathered information about Anderson by physically trespassing onto the residence. Thus, even assuming Anderson was, in fact, within the residence's curtilage, *see* **Dumstrey**, 366 Wis. 2d 64, ¶32, he cannot claim that Shepler violated his reasonable expectation of privacy under real or personal property law—i.e., "the common-law trespassory test"—because Shepler did not physically intrude upon the residence or its curtilage to gather information about Anderson, *see* **Jones**, 565 U.S. at 408-09.

## II. *Anderson did not have an objectively reasonable expectation of privacy in the residence's yard.*

¶17    To demonstrate that an unlawful search occurred under traditional societal norms regarding privacy, a defendant must show: "(1) that he or she had an actual, subjective expectation of privacy in the area searched … and (2) that society is willing to recognize the defendant's expectation of privacy as reasonable." *See* **State v. Baric**, 2018 WI App 63, ¶17, 384 Wis. 2d 359, 919 N.W.2d 221 (citation omitted). We assess this test under the totality of the circumstances. *Id.*, ¶18.

¶18    Our analysis of the totality of the circumstances in this case is guided by a number factors.[5] For starters, the Fourth Amendment does not protect

---

[5] We are mindful that our supreme court has provided additional guidance for assessing an individual's reasonable expectation of privacy by using the following six, non-exclusive factors:

(continued)

7

what a person knowingly exposes to the public eye, even in his or her home. *Florida v. Riley*, 488 U.S. 445, 449 (1989). Accordingly, law enforcement personnel do not violate the Fourth Amendment when they view anything in plain sight from a vantage point where they have the right to be. *Id.* at 449. For example, police officers can walk up to any part of private property that is otherwise open to visitors or delivery people. *United States v. Contreras*, 820 F.3d 255, 261 (7th Cir. 2016); *see also State v. Davis*, 2011 WI App 74, ¶¶9-10, 333 Wis. 2d 490, 798 N.W.2d 902. They can look through windows and doors, and into open garages from a "vantage point on the public way." *Contreras*, 820 F.3d at 261. They can even use certain types of publicly available tools to aid their view of something in plain view, such as binoculars. *Compare id.* (citing *Texas v. Brown*, 460 U.S. 730, 740 (1983)), *with Kyllo v. United States*, 533 U.S. 27, 34 (2001) (concluding that the use of thermal imaging to measure heat emanating from a home was a search under the Fourth Amendment, and thus requiring a warrant, because it was sense-enhancing technology used to gather information regarding the interior of the home that could not otherwise have been obtained without physical intrusion).

---

(1) whether the defendant had a property interest in the premises; (2) whether he [or she] was legitimately (lawfully) on the premises; (3) whether he [or she] had complete dominion and control and the right to exclude others; (4) whether he [or she] took precautions customarily taken by those seeking privacy; (5) whether he [or she] put the property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy.

*State v. Dumstrey*, 2016 WI 3, ¶47, 366 Wis. 2d 64, 873 N.W.2d 502 (citation omitted; alterations in *Dumstrey*). However, Anderson does not make an argument applying these factors specifically, and our analysis functionally applies any necessary factors, given the particular facts of this case.

¶19    The totality of the circumstances here easily shows that Anderson did not have a reasonable expectation of privacy in the residence's yard. The yard at issue is hardly of the type designed by the homeowner to hide from prying eyes—i.e., it lacked the precautions customarily taken by those seeking privacy within their yard. The yard was enclosed only by a "see-through wire" fence, with trees lining one of the yard's boundary lines. Due to its location on the corner of two county roads, any passerby could see into the yard from a public waypoint.

¶20    For this reason, Shepler could view Anderson within plain view. Under the facts of this case, whether Shepler was at street level or at a higher vantage point as was the case here (through the use of a camera), he was able to—and did—see Anderson within the yard because its fence was see-through. Also, there is nothing in the record to suggest that the camera's position was in a place where law enforcement did not have a right to be. *See **Riley***, 488 U.S. at 449. Indeed, Anderson makes no such argument.

¶21    Furthermore, to the extent Anderson complains that the camera used improper sense-enhancing technology to view him within the yard, we disagree. Shepler's uncontroverted testimony was that the camera and its broadcasting capabilities to his laptop are widely available to the general public. Use of technology generally available to the public is a factor that makes the government's action less likely to be an unlawful search prohibited by the Fourth Amendment. *See **Kyllo***, 533 U.S. at 40. Additionally, the technology was not of a nature designed to intrude into otherwise inaccessible areas. We conclude the camera and its close-up, zoom capabilities are more akin to binoculars and, as such, did not transform Shepler's actions into a search under the Fourth Amendment that required a warrant. *See **Contreras***, 820 F.3d at 261 (citing ***Brown***, 460 U.S. at 740). In all, an unlawful search did not occur here because

Shepler plainly viewed Anderson within an area in which he had no objectively reasonable expectation of privacy.

¶22 Finally, we note the only basis that Anderson challenges his subsequent seizure by sheriff's deputies is that they "did not have probable cause to believe [he] was at the property. The probable cause came from the unlawful search." As we have previously discussed, we disagree with the latter assertion. Shepler and the arresting sheriff's deputies' probable cause to believe Anderson was at the residence was not the fruit of an illegal search. Anderson makes no other independent, developed argument that his seizure was unlawful. Accordingly, we conclude the deputies lawfully entered the residence's property to effectuate Anderson's arrest pursuant to an arrest warrant. *See **State v. Delap***, 2018 WI 64, ¶¶30-32, 382 Wis. 2d 92, 913 N.W.2d 175.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.